AO 91 (Rev. 11/11)  Criminal Complaint (approved by AUSA Linwood C. Wright, Jr.)                              USAO CW No. 22-27

# UNITED STATES DISTRICT COURT
for the
Eastern District of Pennsylvania

| United States of America | ) |
|---|---|
| v. | ) |
| Laye Sekou Camara | ) Case No. 22-mj-450 |
| *Defendant(s)* | ) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __June 21, 2017__ in the county of __Philadelphia__ in the __Eastern__ District of __Pennsylvania__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 USC Section 1546(a) | Use of immigration document obtained by fraud |

SEE ATTACHMENT A

This criminal complaint is based on these facts:
See attached Affidavit.

☑ Continued on the attached sheet.

/s/ Thomas K. Eyre
*Complainant's signature*

Thomas K. Eyre, Special Agent HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 03/18/2022 6:46 p.m.

/s/ Honorable Richard A. Lloret
*Judge's signature*

City and state: Philadelphia, Pennsylvania

Hon. Richard A. Lloret, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Thomas Eyre, being duly sworn, state as follows:

### Agent Background And Introduction

1. I am a Special Agent with Homeland Security Investigations ("HSI"), a component of the U.S. Department of Homeland Security ("DHS"). I am currently assigned to the HSI office in Philadelphia, Pennsylvania to a group that investigates war crimes and national security matters. I have been employed as an HSI Special Agent since 2004. I obtained an undergraduate degree and received both basic and advanced training at the Federal Law Enforcement Training Center. I have successfully completed numerous training courses and participated in dozens of investigations involving immigration benefit fraud, document fraud, war crimes, financial fraud, sanctions violations, and national security issues. I also have experience in conducting extra-territorial investigations, including cases in Africa. I have served as the affiant for criminal complaints and search warrant applications. I have conducted numerous investigations involving violations of the United States Code.

2. I am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516. As such, I am an "investigative or law enforcement officer" within the meaning of 18 U.S.C. § 2510(7) and a "federal law enforcement officer" as defined in Rule 41 of the Federal Rules of Criminal Procedure. I am an "Immigration Officer" as defined in 8 CFR 1.2 and a "Customs Officer" as defined in 19 U.S.C. § 1401(i).

3. For the reasons set forth below, I submit that there is probable cause to believe that Laye Sekou CAMARA, a.k.a. "K-1," a.k.a. "Dragon Master," fraudulently obtained an alien registration receipt card (also known as a "green card") and used that fraudulently obtained green card at the Pennsylvania Department of Transportation ("PennDOT") on June 21, 2017 in support of PennDOT Form DL-54A (application for initial identification card) to prove his immigration status in the U.S. to meet the identification requirements of PennDOT, in violation of 18 U.S.C. § 1546(a).

4. I base this affidavit on my personal knowledge, training, and experience, and information that I have received as a result of my participation in this investigation and a review of documents and information furnished to me by fellow HSI agents, HSI analysts, HSI Task Force Officers, and a Special Agent with the Pennsylvania Office of the Attorney General ("PA-OAG"). I submit this Affidavit for the limited purpose of establishing probable cause for a Criminal Complaint. Accordingly, this Affidavit does not contain all facts known to me regarding this investigation.

## Liberia Background

5. Liberia is a small country located in West Africa. In 1980, Samuel K. Doe seized power in a coup during which Liberia's then president, William Tolbert, was assassinated. In 1985, Doe was elected president in what was widely accepted as a fraudulent election, although his government was recognized by the international community, including the United States.

6. Doe was an authoritarian ruler, first as Liberia's *de facto* leader and later as its president. Doe's administration was repressive and corrupt. Consequently, in the late 1980s, the National Patriotic Front of Liberia ("NPFL") rebel group was formed by Charles Taylor and others. On December 24, 1989, Taylor's NPFL forces attacked Liberia through the Ivory Coast, and initiated an offensive aimed at overthrowing Doe. This was the beginning of Liberia's First Civil War.

7. The NPFL met fierce resistance from the Armed Forces of Liberia ("AFL"), as well as from rebel groups aligned with the AFL. The summary execution and torturing of civilians, weaponized rape, ritualistic cannibalism, and the use of child soldiers were the norm throughout the conflict. Much of this conduct was based on ethnic divisions. In 1997, after approximately two years of interim governments, Taylor was elected president of Liberia, in what is overwhelmingly accepted as a free and fair election.

8. Taylor's government was a kleptocracy buttressed by state-sponsored violence. His government fueled resentment from many in Liberia. Consequently, in 1999, Liberia's Second Civil War began. Two rebel groups -- Liberians United for Reconciliation and Democracy ("LURD"), and the Movement for Democracy in Liberia ("MODEL"), both successors to rebel groups that supported the AFL during Liberia's First Civil War -- waged war against Taylor's government. LURD's stated objective was to remove Taylor from the presidency of Liberia. Liberia's Second Civil War, much like its first, was known for its atrocities, many of which were perpetrated by LURD rebels.

9. With the arrival of peacekeepers from the Economic Community of West African States, and facilitation by the government of the United States, on August 11, 2003, Taylor resigned as president of Liberia and went into exile in Nigeria.

## Laye Sekou CAMARA Investigation

10. In July 2021, your affiant, PA-OAG, and other federal officials began investigating CAMARA.

11. On June 15, 2011, CAMARA submitted a United States Department of State Form DS-160 (Non-Immigrant Visa Application) online. In answering questions on his application, CAMARA asserted, among other things, that he had never been a member of or involved with a paramilitary unit, vigilante unit, rebel group, guerrilla

2

group or insurgent organization. On June 24, 2011, CAMARA's application for a visa was granted. On June 30, 2011, CAMARA used this non-immigrant visa to enter the U.S. CAMARA departed the U.S. in early August 2011.

12. On August 11, 2011, CAMARA submitted and signed a United States Department of State Form DS-230 (Application for Immigrant Visa and Alien Registration). On June 14, 2012, CAMARA was interviewed by U.S. State Department personnel in Dakar, Senegal about his application. At the conclusion of his interview, CAMARA swore that the answers given in his DS-230 were truthful (as evidenced by his signature on page 4 of the form).

13. On his DS-230, CAMARA asserted, in answering Question 40.f. under "Part II-Sworn Statement," that he had never sought or was seeking a visa, entry into the United States, or any immigration benefit by fraud or misrepresentation. CAMARA's Immigrant Visa application was granted on September 14, 2012. On November 22, 2012, CAMARA entered the U.S. through New York City and became a lawful permanent resident upon his admission. His lawful permanent residency was evidenced by his subsequent receipt of a green card, which was the result of the granting of his fraudulent Form DS-230 application. CAMARA has a valid Pennsylvania license that expires in July 2023. CAMARA's PennDOT photo from December 2019 is on the bottom right of this page.

14. The investigation has revealed that contrary to CAMARA's representation in his DS-160 that he had never been a member or involved in a paramilitary unit, vigilante group, rebel group, guerrilla or insurgent organization, that in fact, he was a high-ranking member of the LURD rebel group during Liberia's Second Civil War.

15. The investigation revealed that CAMARA was prominently pictured with other LURD rebels in the *New York Times* in 2003. He was also pictured in a 52-minute documentary titled *Liberia: An Uncivil War.* In this 2004 documentary, CAMARA was prominently featured behind then-American Ambassador John Blaney in 2003. A photo of CAMARA, who was wearing a camouflage jacket, is on the bottom left of this page.



3

16. Your affiant has also reviewed the *Country Reports on Human Rights Practices for 2003* concerning Liberia, which was published by the U.S. State Department's Bureau of Democracy, Human Rights, and Labor on February 25, 2004. In this document, LURD forces are described, and "Sekou KAMARA" is identified as also being known as General K1 and General Dragon Master. The report states that K1/Dragon Master was "in hiding after he allegedly killed a fellow LURD General known as Black Marine."

17. On February 10, 2022, your affiant, a Special Agent with PA-OAG, and other federal personnel interviewed John Blaney, the former American Ambassador in Liberia in 2003, pictured in paragraph 15 above. Ambassador Blaney, who is retired, recalled dealing with LURD General Dragon Master and another LURD commander named General Cobra. Ambassador Blaney further advised that Defense Attaché Colonel Sue Ann Sandusky was also stationed at the American Embassy in 2003 and that she had more direct contact with General Dragon Master. Ambassador Blaney stated that General Dragon Master was a high-ranking and active combatant in LURD, which he described as a large and formidable Liberian rebel group engaged in atrocities during Liberia's Second Civil War, and that General Dragon Master would not be someone who meets visa issuance criteria.

18. On February 16, 2022, your affiant, a Special Agent with PA-OAG, and other federal personnel interviewed Colonel Sandusky. Colonel Sandusky, who is retired, recalled dealing extensively with General Dragon Master while she was stationed in Liberia in 2003. Colonel Sandusky stated that she met General Dragon Master about ten times in Liberia in 2003. Colonel Sandusky stated that Dragon Master was a high-ranking LURD general and the Embassy's primary point of contact with LURD for Embassy personnel who sought safe passage across a specific bridge in Monrovia that separated the warring factions, specifically, Taylor's forces and LURD.

19. On February 16, 2022, Colonel Sandusky provided investigators with a public online photograph of General Dragon Master, and conclusively identified the individual pictured on the left of the photograph on the top of the next page as General Dragon Master. The photo is captioned, "Rebels from Liberians United for Reconciliation and Democracy (LURD) celebrate 05 August 2003 near the suburb of Viaton upon the arrival of journalists who with aid workers were able for the first time to cross the bridge linking the government-held town centre and the rebel-controlled districts around Monrovia's main seaport."

4



20. Your affiant has also reviewed public video footage from the *Associated Press* taken on August 12, 2003. The 3 minutes and 21 seconds of footage includes footage of an American flagged motorcade, American Embassy officials including Ambassador Blaney. Colonel Sandusky advised investigators that General Dragon Master is the individual wearing a head covering on the left side of the video still below, to Ambassador Blaney's right. During this informal press conference, Ambassador Blaney announced that LURD had agreed to a declaration to give permission to peacekeepers from a multi-national force to enter the port of Monrovia. Ambassador Blaney then introduced LURD leader Sekou Fofana, who is also in close physical proximity to General Dragon Master.



### CAMARA's False Statements On Non-Immigrant And Immigrant Visa Applications

21. Based on my training and experience, I submit that CAMARA obtained his June 2011 non-immigrant visa by fraud. To wit, CAMARA's concealment of his membership in the LURD rebel group, was a material fact. Had that information been divulged, CAMARA likely would have been denied a non-immigrant visa due to LURD's nexus to violent activity and human rights violations. In any event, it would have

5

affected agency action, particularly as LURD had been designated a Tier III terrorist group.  CAMARA also obtained his Immigrant Visa by fraud.  On the DS-230 Immigrant Visa application, CAMARA stated that he was not seeking "…or has sought a visa…by fraud or misrepresentation".  As stated, CAMARA had in fact previously obtained an immigration benefit (a non-immigrant visa) by fraud or misrepresentation by concealing his membership with the LURD rebel group and was currently seeking the Immigrant Visa by fraud.

22. Your affiant has reviewed the PennDOT photo of CAMARA as well as the photos that portray General Dragon Master in the Getty Images photo, the AP video footage, the *New York Time*s photo, and footage from the documentary.  Your affiant concludes that all of these people are all one and the same individual:  Laye Sekou CAMARA, a.k.a. "K-1," a.k.a. "General Dragon Master."

### CAMARA's Use Of A Fraudulently-Obtained LPR Card At The Pennsylvania Department Of Transportation

23. On June 21, 2017, CAMARA submitted a DL-54A, Application for Initial Identification Card, to PennDOT's facility on Island Avenue in Philadelphia.  On his application, CAMARA listed an address on Dicks Avenue in Philadelphia as his home address.  In support of his application, CAMARA submitted his green card, which card he had received as the result of the approval of his DS-230.  This green card expires December 7, 2022.

24. Under 18 U.S.C. § 1546(a), it is unlawful for someone to utter, use, attempt to use, possess, obtain, accept, or receive any such visa, permit, border crossing card, alien registration receipt card, or other document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States knowing it to be forged, counterfeited, altered, or falsely made, or to have been procured by means of any false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained.

### Conclusion

25. I submit that there is probable cause, based on the information set forth above, to find that CAMARA used a green card that was procured by means of any false claim or statement, or fraud, by providing it to PennDOT, within the Eastern District of Pennsylvania, on June 21, 2017.  To wit, CAMARA made a false statement on the DS-230 when he stated that he had not previously sought, nor was he currently seeking, a visa through fraud or misrepresentation.  This specific statement on his DS-230 was false because CAMARA had made a prior false statement on his DS-160 in June 2011, in which CAMARA falsely stated that he was not part of a rebel group.

6

26. The false statement on the DS-230 enabled CAMARA to procure his green card in 2012 by means of a false claim or statement or to have been otherwise procured by fraud or unlawfully obtained. In turn, he used this unlawfully procured green card (issued in 2012) at PennDOT in Philadelphia on June 21, 2017, in violation of 18 U.S.C. § 1546(a).

Respectfully submitted,

*/s/ Thomas Eyre*
_____
Special Agent Thomas Eyre
Homeland Security Investigations

Sworn to and subscribed before me this 18th day of March 2022.

*/s/ Honorable Richard A. Lloret*
_____
HON. RICHARD A. LLORET
United States Magistrate Judge

7

# ATTACHMENT A

## COUNT ONE

On or about June 21, 2017, in the Eastern District of Pennsylvania, defendant LAYE SEKOU CAMARA knowingly used a document prescribed by statute or regulation for entry into or evidence of authorized stay in the United States, knowing it to have been procured by false statement or to have otherwise been procured by fraud; that is, the defendant knowingly presented to the Pennsylvania Department of Transportation as evidence of authorized stay in the United States, his U.S. alien registration receipt card (green card), which card he received as a result of the approval of his Form DS-230 Application for Immigrant Visa and Alien Registration, in which he made a false statement with respect to a material fact, that is, he falsely answered "No" to Question 40.f. of Part II of the Form DS-230, in which he denied being a member of a class of individuals excluded from entry into the United States by reason of seeking "or [having] sought a visa, entry into the United States, or any immigration benefit by fraud or misrepresentation," when as the defendant knew, he had previously sought a visa and entry into the United States by false statement and fraud, in that he submitted a Form DS-160 Temporary Non-Immigrant Visa Application, in which he falsely answered "No" to the question "have you ever served in, been a member of, or been involved with a paramilitary unit, vigilante unit, rebel group, guerrilla group or insurgent organization?," in violation of 18 U.S.C. § 1546(a).